IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| FITZGERALD'S LAKEFOREST MOTORS, INC. | * * * |
| v. | Civil Action No. CCB-19-2261 |
| TOYOTA MOTOR SALES USA, INC. | * * * * * |

*****

# MEMORANDUM

This action concerns a dispute over payments relating to warranty repairs. The plaintiff, Fitzgerald's Lakeforest Motors, Inc. ("Fitzgerald"), raises claims under Title 15 of the Transportation Chapter of the Maryland Code against Toyota Motor Sales USA, Inc. ("Toyota"). Before the court are the parties' cross motions for partial summary judgment (ECF 53; ECF 54). The matter has been fully briefed and Fitzgerald has requested a hearing. No hearing is necessary as the court is able to resolve the motions on the briefing. *See* Local Rule 105(6) (D. Md. 2021). For the reasons stated herein, the court will deny Fitzgerald's motion for summary judgment and grant in part and deny in part Toyota's motion for summary judgment.

## FACTS

The plaintiff, Fitzgerald's Lakeforest Motors, is an automobile dealership in Gaithersburg, Maryland, which is licensed to sell and service the defendant Toyota's motor vehicles. (ECF 29, Ans. at ¶ 3). Pursuant to its dealership agreement, Fitzgerald performs certain repairs on behalf of Toyota to honor Toyota's warranty obligations. (ECF 53-2, Ex. 1, Steinbarth Aff. at ¶ 7). At the heart of this case are the markups charged on replacement parts installed pursuant to warranty by automobile dealerships—and who should pay for them. Typically, a dealer pays the "dealer cost" for replacement parts from the manufacturer, which is generally below the Manufacturer

1

Suggested Retail Price ("MSRP"). The dealer then sells the part to the consumer at a retail price, which generally exceeds the MSRP. For example, for $110.59 Fitzgerald can obtain transmitter assemblies, which have an MSRP of $183.94 (dealer cost plus 66 percent) and which Fitzgerald sells at retail for $207.85 (dealer cost plus 88 percent or MSRP plus 13 percent). (*See* ECF 53-2, Ex. 1, Steinbarth Aff. at ¶ 11). But when a part is replaced pursuant to warranty, rather than by the consumer, how much should the manufacturer reimburse the dealer for performing repairs? This case poses that question with respect to two categories of repairs made by Fitzgerald on behalf of Toyota: (1) the replacement of warranty parts between August 12, 2016, and August 31, 2020; and (2) the replacement of Audio Navigation units between February 17, 2017, and August 31, 2020. Each category is explained in more detail in the sections to follow.

    **I.**    **Replacement of General Warranty Parts**

Prior to 2016, Toyota reimbursed Fitzgerald for parts used in meeting warranty obligations at the MSRP. (*See* ECF 53-3, Ex. 2, Toyota's Am. Resp. to First Inter., No. 2). The MSRP warranty reimbursement rate between 2016 and 2020, though different depending on the part in question, averaged between 65.6 percent and 66.7 percent markup. (*Id.*). At the same time, Fitzgerald's own pricing scheme was designed to generate, on average, a price for parts sold to retail customers of dealer cost plus 100 percent. (*See* ECF 53-2, Ex. 1, Steinbarth Aff. at ¶¶ 9–10).

Believing it was legally entitled to a higher rate of compensation under the Maryland Code, Fitzgerald submitted a request for an increased markup rate. On June 11, 2016, Gregg Steinbarth, General Counsel for Fitzgerald, submitted the request for an increased retail parts markup of 99.7 percent on behalf of the dealer. (*See* ECF 53-2, Ex. 1(A) at 6). The request included what Fitzgerald claimed were "102 qualifying sequential customer-paid repair orders . . . completed within the last

180-days." (*Id.*). The letter stated that "[r]etail customers paid for each of the repair orders" Fitzgerald submitted. (*See id.*).

On July 11, 2016, Timothy Bliss, Toyota's General Manager for the Central Atlantic Region, sent a letter denying the request because it "does not satisfy Maryland law § 15-212(c)." (ECF 53-2, Ex. 1(B) at 12). The letter contained an inexhaustive summary of the alleged deficiencies, including that many of the repair orders were for routine maintenance rather than warranty work, were for non-customer-paid repairs, were for non-Toyota parts, and failed to include 100 qualifying sequential repair orders. (*See id.* at 12–14). For example, Bliss wrote that many of the repair orders were for routine service on brakes, spark plugs, belts, and fuses, which "should not have been included in the calculation of the requested markup rate." (*Id.* at 12–13). Additionally, Bliss stated that after those non-qualifying repairs were removed, the submission no longer contained 100 qualifying sequential orders as required by statute. (*Id.* at 14). Therefore, he concluded, Toyota asserted that the declared rate was "not presumed to be accurate" and Toyota had "no obligation to rebut [Fitzgerald's] declared rate." (*Id.*). Toyota's expert witness, Michael Snyder, testified that Fitzgerald's submission was materially inaccurate, but also stated he had "no way to know" what the accurate rate was because if the "submission is inaccurate" that would "cause the rate that's documented within it to be inaccurate" as well. (ECF 53-9, Ex. 8, Snyder Dep. at 43–44).

Nearly three years later, on May 22, 2019, Steinbarth submitted another request on behalf of Fitzgerald for an increased retail parts markup, this time for 104.8 percent, along with "100 qualifying sequential customer-paid repair orders . . . completed within the last 180-days." (ECF 53-2, Ex. 1(C) at 17). The request stated that retail customers "paid for each of the repair orders" and each repair "has a Toyota warranty operation code associated with it." (*Id.*).

3

On June 19, 2019, Damon Rose, then Toyota's General Manager for the Central Atlantic Region, sent a letter to Fitzgerald rebutting this request for substantially the same reasons it had denied the 2016 request. (*See* ECF 53-2, Ex. 1(D) at 22–24).

According to David Jenkins, Fitzgerald's Director of Sales and Service Operations, from August 12, 2016, to June 23, 2019, Toyota reimbursed Fitzgerald for warranty parts at MSRP for a total of $1,774,713.32. (ECF 53-6, Ex. 5, Jenkins Aff. at ¶ 5). If Toyota had applied the 99.7 percent markup as requested, it would have owed Fitzgerald $2,914.168.90. (*Id.*). From June 24, 2019, to August 31, 2020, Toyota continued to reimburse Fitzgerald for warranty parts at MSRP for a total of $480,516.36. (*Id.* at ¶ 6). If Toyota had applied the 104.8 percent markup as requested during this period, it would have owed Fitzgerald $810,484.10. (*Id.*). Thus, Fitzgerald believes that it is owed at least an additional $1,469,432.32 for the warranty repairs it made over this time period. (*Id.* at ¶ 7).

## II.     Replacement of Audio Navigation Units

Pursuant to its warranty obligations, Fitzgerald also replaces Audio Navigation units covered by Toyota's warranty. Under Toyota policy, these units are shipped to Fitzgerald at no cost. (*See* ECF 53-7, Ex. 6, Houser Aff. at ¶ 5). Though the units are typically rebuilt by a third party, Fitzgerald uses the same parts number as the Audio Navigation units originally installed in the vehicle to order these replacement units. (*See id.* at ¶ 6). Toyota does not pay any parts markup percentage for the Audio Navigation units but it does pay a processing fee. (*See* ECF 53-6, Ex. 5, Jenkins Aff. at ¶ 13).

Between February 17, 2017, and June 23, 2019, Fitzgerald performed 84 replacements and was paid a $27.40 processing fee for each, for a total of $2,301.60. (*Id.* ¶ 9). If Toyota had paid the 99.7 percent markup during this period, it would have owed Fitzgerald $230,749.80. (*Id.*).

4

Between June 24, 2019, and August 31, 2020, Fitzgerald performed an additional 19 replacements and was paid the same $27.40 processing fee for each unit, for a total of $520.60. (*Id.* at ¶ 10). If Toyota had paid the 104.8 percent markup during this period, it would have owed Fitzgerald $58,255.40 (*Id.*). Thus, Fitzgerald believes it is owed at least an additional $286,183 for the Audio Navigation units it replaced over this time period. (*Id.* at ¶ 11).

## PROCEDURAL HISTORY

Fitzgerald filed this action against Toyota in the Circuit Court for Frederick County, Maryland on July 11, 2019. (ECF 1, Notice of Removal at 1). On August 5, 2019, Toyota removed the action to this court. (*Id.*). Fitzgerald has since filed an amended complaint, now the operative complaint, (ECF 26), which Toyota has answered, (ECF 29). Fitzgerald raises four counts for violations of different sections of the Transportation Chapter of the Maryland Code: (1) § 15-212; (2) § 15-206.1; (3) § 15-212(c)(5); and (4) § 15-212(c)(7). It seeks a declaratory judgment, to enjoin the defendant from such violations in the future, and monetary damages for losses suffered because of past violations. (*See generally* ECF 26, Am. Compl.). On September 11, 2020, Fitzgerald filed its motion for partial summary judgment on Counts I and III of its amended complaint. (ECF 53). Toyota has opposed the motion and filed a cross motion for summary judgment as to Counts I and II of Fitzgerald's amended complaint and for judgment on the pleadings as to Counts III and IV. (ECF 54). The matter is now fully briefed and ready for resolution.

## LEGAL STANDARD

Motions for judgment on the pleadings under Federal Rule of Civil procedure 12(c) are decided under the same standard as motions under Rule 12(b)(6). *Independence News. Inc. v. City of Charlotte*, 568 F.3d 148, 154 (4th Cir. 2009). To survive a motion to dismiss, the factual

allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart,* 680 F.3d 359, 365 (4th Cir. 2012)).

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party,

*Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## DISCUSSION

At the heart of this case is a dispute over the proper interpretation of Sections 15-212 and 15-206.1 of the Transportation Chapter of the Maryland Code. Fitzgerald moves for summary judgment as to Counts I (Section 15-212) and III (Section 15-212(c)(5)), and Toyota moves for summary judgment as to Counts I (Section 15-212) and II (Section 15-206.1) and for judgment on the pleadings as to Counts III (Section 15-212(c)(5)) and IV (Section 15-212(c)(7)). The court addresses each count in turn.

### I.   Count I: Violation of Md. Code Ann., Transp. § 15-212

Fitzgerald and Toyota have both moved for summary judgment on this count. To resolve these cross-motions, the court must interpret, as a matter of first impression, the relevant portion of the Maryland code. The court will therefore examine the statutory framework, summarize the competing arguments, and then analyze the issues.

#### A.   *The Statutory Framework*

Title 15 of the Transportation Chapter of the Maryland Code codifies the state's motor vehicle laws. Subtitle 2 of Title 15 regulates, among other things, the relationship between automobile manufacturers and dealers. And Section 15-212—the specific provision at issue here—defines the duties a licensee distributor or manufacturer owes to its licensed dealers. Licensees

7

must specify in writing a dealer's obligations with respect to vehicle warranties and product recalls and the schedule of compensation to be paid to the dealer for parts assemblies and labor in connection with the dealer's obligations. *See* Md. Code Ann., Transp. (hereinafter "Transp.") § 15-212(c)(1)(i)–(ii). "Reasonable compensation" with respect to labor for warranty or recall repairs may not be less than "the dealer's current labor rate for nonwarranty repairs of a like kind for retail customers," *id.* § 15-212(c)(2)(i), and with respect to any part may not be less than "the dealer's cost plus its current retail mark-up percentage charged to retail customers for nonwarranty repairs of a like kind," *id.* § 15-212(c)(2)(ii).

Not more than once a year, a dealer may request in writing that a licensee revise the compensation schedule. *See id.* § 15-212(c)(3)(iii). This is to be accomplished "by a submission to the licensee of . . . 100 qualifying sequential customer-paid repair orders[.]" *Id.* § 15-212(c)(3)(i). The schedule of compensation "shall be equal to the parts mark-up percentage as reflected in qualifying repair orders, calculated by dividing the total charges for parts in the repair orders by the total dealer cost for the parts minus one." *Id.* § 15-212(c)(3)(ii). The statute does not define a qualifying repair order, but excludes as qualifying repair orders those in connection with "repairs performed[] at wholesale or for insurance carriers[] or other third-party payors," or those in connection with "[r]outine maintenance not covered under any warranty, including maintenance involving fluids, filters, and belts not provided in the course of repairs[.]" *Id.* § 15-212(c)(4)(v), (vi). The schedule of compensation submitted by dealers "shall be presumed to be accurate and reasonable." *Id.* § 15-212(c)(6).

A licensee "shall approve or rebut the dealer's submission within 30 days of receipt." *Id.* § 15-212(c)(6)(i). A licensee may rebut the submission within thirty days of receipt with "reasonable substantiating evidence that the declared rate is materially inaccurate." *Id.* § 15-212(c)(6)(v). If a

licensee approves or fails to timely rebut the submission, the rate submitted by the dealer is approved and goes into effect on the thirty-first day following receipt of the submission. *Id.* § 15-212(c)(6)(iv).

A person who suffers financial injury as a result of a violation of these provisions may recover damages and reasonable attorneys' fees. *See id.* § 15-213. However, any action commenced under Section 15-213 and concerning the mark-up percentage and the schedule of compensation "shall be limited to whether the labor rate or parts mark-up percentage stated in the dealer's submission was materially inaccurate." *Id.* § 15-212(c)(6)(vii)(1). The burden is on the licensee to demonstrate the dealer's submission was materially inaccurate. *Id.* § 15-212(c)(6)(vii)(2). Additionally, a dealer or distributor may request a hearing with the state transportation agency to "resolve a dispute under any provision of [Title 15] between a dealer . . . and a manufacturer, distributor, or factory branch; or seek clarification or interpretation of any provision of this subtitle." *Id.* § 15-214(1)–(2).[1]

### B. The Parties' Arguments

Toyota's position is that if a dealer's proposed parts mark-up percentage is not calculated based on 100 qualifying sequential customer-paid repair orders, then by definition it cannot be materially accurate. It states that it is undisputed that Fitzgerald failed to submit 100 *qualifying* repair orders because many of the repair orders submitted were not customer-paid repair orders, were not sequential, or were for repairs which are not covered under any Toyota warranty or which are statutorily excluded.

---

[1] If the parties wish to resolve their dispute through an administrative procedure, they may move the court to stay the case to allow counsel to seek a hearing pursuant to Md. Code Ann., Transp. § 15-214(2). Such a hearing would allow the state to clarify the law and could resolve the dispute between the parties.

9

Fitzgerald contends that Toyota has violated Section 15-212 by failing to reimburse it for warranty parts at its retail rate; it states there are "no actions or procedural hoops that [it] must jump through in order to trigger [Toyota's] obligation" to "reasonably compensate Fitzgerald for Warranty Parts." (ECF 53 at 11). Fitzgerald claims that when it submitted its requests for markups in 2016 and 2019, Toyota failed to adequately rebut its requests because it did not present substantiating evidence that the declared rates were materially inaccurate, as required under Section 15-212(c)(6)(v)(2). As a result, it contends, the rates proposed by Fitzgerald went into effect by default on the thirty-first day following Toyota's receipt of each request. Additionally, Fitzgerald contends that this court is limited to reviewing only whether the proposed markup was materially inaccurate or not. *See* Transp. § 15-212(c)(6)(vii)(1).

    *C. Analysis*

There is a threshold issue as to the scope of this court's review. Section 15-213 provides any injured party with the right to sue for damages arising out of a violation of the provisions at issue in this litigation, but § 15-212(c)(6)(vii)(1) provides that in any action commenced under § 15-213 and involving "the application of paragraph (3) of this subsection, the issues shall be limited to whether the labor rate or parts mark-up percentage stated in the dealer's submission was materially inaccurate." Paragraph (3) concerns the establishment of a compensation schedule for labor and parts mark-up percentages. *See* Transp. § 15-212(c)(3). Thus, if this action can be said to "involve the application" of that paragraph, it follows that the issues "shall be limited" to whether the percentages proposed by Fitzgerald were materially inaccurate.

This claim certainly involves paragraph (3). At the heart of the case, after all, is a question about the establishment of a compensation schedule and the material accuracy or inaccuracy thereof. Therefore, it appears Fitzgerald is correct that this court's review is limited to the issue of

whether its proposed markup percentages were materially inaccurate or not. Yet the parties debate whether in reviewing this issue the court is restricted to a measurement of how far from the actual retail markup the proposed markup was, or whether it embraces a broader concept permitting review of the inputs that led to the proposed markup.

It must be the latter, for it would be illogical to read the statute as granting courts the power to review the material accuracy of a proposed mark-up percentage while depriving them of the means to do so in a manner faithful to the statutory requirements.[2] *See Kemp v. Nationstar Mortg. Ass'n*, 248 Md. App. 1, 13 (2020) ("We avoid interpretations that lead to illogical or absurd results[.]"). The material accuracy of a submission naturally depends on what is required to be submitted. Therefore, the court holds that the scope of judicial review embraces whether the 100 repair orders submitted by Fitzgerald complied with the statutory requirements.

The upshot is that there is a genuine dispute of material fact which precludes summary judgment on this claim. The record indicates that Fitzgerald asserted that its markup percentage was accurate based on what it describes as "102 qualifying sequential customer-paid repair orders . . . completed within the last 180-days." (ECF 53-2, Ex. 1(A) at 6). But the record also indicates that Toyota rejected this assertion, claiming that many of the repair orders were for routine maintenance, were not paid by customers, were not for Toyota parts, or were otherwise not qualifying orders. (ECF 53-2, Ex. 1(B) at 12–14). This factual dispute is for the jury to resolve. The court will deny both motions for summary judgment.

---

[2] The parties have not provided, and the court was not able to find, any legislative history that might resolve the particular question of statutory interpretation presented here. Toyota notes that several other states have statutes regulating the reimbursement of warranty repairs done by dealers on behalf of distributors or manufacturers, *see, e.g.*, N.Y. Code Ann., Vehicle and Traffic Laws § 465; Ohio Rev. Code. Ann., Motor Vehicles § 4517.52, but those statutes do not appear to include a limitation on review akin to the one at issue here.

11

## II.     Count II: Violation of Md. Code Ann., Transp. § 15-206.1

Toyota has moved for summary judgment on this count. Section 15-206.1 of the Maryland Transportation Code imposes on a manufacturer or distributor a duty of good faith (1) in acting or purporting to act under the terms, provisions, or conditions of any franchise agreement and (2) in any transaction or conduct governed by Subtitle 2 of Chapter 15. *See* Transp. § 15-206.1(b). The statute defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *Id.* § 15-206.1(a). The legislature intended this subsection to apply the definition of good faith under the Uniform Commercial Code to manufacturers in their dealings with franchised dealers. *See Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.*, 738 F. Supp. 2d 640, 653 (D. Md. 2010). This does not impose any new or additional obligations on the franchising party, but rather requires that one party to the contract not frustrate the other party's performance. *See id.* There is little caselaw applying this requirement, but another judge of this court has found persuasive cases from other jurisdictions with similar statutes which have held that a franchisor's actions were "not in bad faith where they were motivated by legitimate business interest." *Id.* at 654 (citing *Hickman v. Am. Honda Motor Co.*, 982 F. Supp. 881, 885–86 (N.D. Ga. 1997); *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58, 63 (1st Cir. 1992)).

Fitzgerald alleges in its amended complaint that Toyota "refused to cooperate in good faith" when Fitzgerald "attempted on numerous occasions to work with [Toyota] to have [Toyota] pay the retail rates," (ECF 26 at ¶ 42), and that Toyota should have "responded with a calculation of what it believes to be the proper rate under the statute," (*id.* at ¶ 43). Toyota argues it is entitled to summary judgment on this count because it "timely and justifiably denied the Submissions in good faith as non-compliant and materially inaccurate" and that it has no obligation under the law

12

to "calculate a corrected parts mark-up percentage." (ECF 54 at 22–23). Fitzgerald responds that the facts indicate Toyota has rejected every submission by Fitzgerald and other Maryland dealers for warranty reimbursement at the dealer's retail parts mark-up percentage, and alleges that Toyota rejected its 2016 submission in part because it included brake pad repairs and then rejected the 2019 submission for excluding them.[3]

Toyota has a legitimate business interest (paying MSRP rather than a higher retail markup for its warranty repairs) and the record provides some support for Toyota's good-faith belief that the law was on its side in refusing to calculate a corrected parts mark-up percentage: Its letters in response to Fitzgerald's requests were fairly detailed, identifying a significant number of repair orders by number and explaining their alleged deficiencies. Whether Toyota routinely rejects other dealers' claims may be relevant to the issue of good faith, if Fitzgerald is able to properly support the admissibility of such evidence, but it appears that Fitzgerald may have been the only dealer in the Mid-Atlantic Region that actually submitted such a proposed schedule of compensation. (*See* ECF 53-5, Ex. 4., Upright Dep. at 36:5–8 (Question: "How many Toyota dealers in the Central Atlantic Region have submitted a parity request since 2016?" Answer: "To my knowledge, one, Fitzgerald.")). As for the discrepancy with the brake pads, it appears in 2016 Toyota objected to the inclusion of brake repairs because they are statutorily excluded, and in 2019 objected to the inclusion of only *some* brake repairs because omitting some meant the repair orders would not be sequential as required by statute. (*See* ECF 53-2 at 12, 24; ECF 54-12, Ex. L, Zanandrie Dep. at

---

[3] Fitzgerald apparently is relying on the 2016 rebuttal, which stated that five repair orders included in the submission were for brake repairs which, as routine maintenance, "should not have been included in the calculation of the requested markup rate," (ECF 53-2 at 12), and the 2019 rebuttal, which states that the submission "contains many Repair Orders that should not have been included," and "when these Repair Orders are removed from the Submission, it no longer contains the required number of 100," (*id.* at 24).

13

214). Still, as Fitzgerald argues, good faith is typically an issue of fact for a jury to resolve. *See Jackson v. Std. Fire Ins. Co.*, 406 F. Supp. 3d 480, 498 (D. Md. 2019) (interpreting good faith requirement of Courts and Judicial Proceedings and Insurance Chapters of Maryland Code). The court will therefore deny the motion for summary judgment on this count and allow this claim to proceed along with Count I.

### III. Count III: Violation of Md. Code Ann., Transp. § 15-212(c)(5)

Fitzgerald has moved for summary judgment on this count, and Toyota has moved for judgment on the pleadings, or in the alternative for summary judgment. Section 15-212(c)(5) provides that "[i]f a licensee gives a dealer a part at no cost to use in performing a repair under a recall . . . or warranty repair, the licensee shall compensate the dealer for the part by paying the dealer the parts mark-up percentage . . . on the cost for the part listed on the licensee's price schedule."

First, as to Toyota's Rule 12(c) argument, Toyota claims the complaint is deficient and that that it only learned the Audio Navigation units were at issue during discovery. It is true the complaint makes no reference to these units but only alleges in general terms that "[o]n numerous occasions after Fitzgerald served [Toyota] with the June 2016 Request and after Fitzgerald served [Toyota] with the May 2019 Request [Toyota] has provided a part to Fitzgerald to be used in performing warranty obligations at no cost and has not paid Fitzgerald its parts mark-up percentages[.]" (ECF 26, Am. Compl. at ¶ 49; *see also id.* at ¶ 23). But even if the court were to dismiss this claim, given the facts cited in Fitzgerald's summary judgment memorandum, a dismissal should be without prejudice and with leave to amend. In light of that, and given the length of time that Toyota has waited to seek judgment on the pleadings, the court will construe its motion as one for summary judgment.

14

Fitzgerald argues that the Audio Navigation units it replaces are covered by Toyota's warranty and are shipped to Fitzgerald at no cost, and yet Toyota only pays Fitzgerald a small processing fee rather than the mark-up percentage. Fitzgerald's Parts Director, Christopher Houser, has testified that he places orders for the replacement Audio Navigation units pursuant to Section 4.13 of Toyota's warranty policy. (*See* ECF 53-7, Ex. 6, Houser Decl. at ¶¶ 4–5). To place these orders, he states, Toyota's policy requires that he use the same part number as for the Audio Navigation unit originally installed in the vehicle. (*See id.* at ¶ 6). Rather than being reimbursed a parts markup percentage for each Audio Navigation unit replaced, Toyota pays Fitzgerald a $27.40 processing fee per part replaced.

Toyota argues that Fitzgerald has failed to show that it "established" a parts mark-up percentage under the statute in the first place. *See* Transp. § 15-212(c)(5) ("the licensee shall compensate the dealer for the [no-cost] part by paying the dealer the parts mark-up percentage *established* under this subsection[.]" (emphasis added)). Additionally, Toyota argues that even if a compensation schedule had been properly established, Fitzgerald must show that (1) Toyota provided a part to Fitzgerald; (2) at no cost; (3) for use in performing a warranty repair; and (4) the warranty replacement part had a cost listed on Toyota's price schedule. It contends that Fitzgerald cannot satisfy the first or fourth of those elements.

The court does not find Toyota's first argument persuasive. Even if Fitzgerald did not establish its own parts mark-up percentage, the statute imposes on licensees a duty to create a "compensation schedule," *see* Transp. § 15-212(c)(1), which is a term the statute uses interchangeably with "parts mark-up percentage." For example, section 15-212(c)(3) refers to a "labor rate or parts mark-up percentage" to be established by a submission of qualifying repair orders, while section 15-212(c)(6) refers to "[t]he schedule of compensation submitted under

15

paragraph (3)," which is presumed to be accurate. Thus, even if Fitzgerald did not adequately establish a parts mark-up percentage on its own terms, Toyota was under an obligation to "specify in writing" the "schedule of compensation to be paid to the dealers for parts[.]" Transp. § 15-212(c)(1).

However, there is a genuine dispute of material fact concerning whether Toyota "provided" any Audio Navigation parts to Fitzgerald. Toyota cites to evidence showing that third-party vendors supplied these replacement parts (*see* ECF 54-7, Ex. G, Klein Decl. at ¶¶ 16–18); Fitzgerald cites to evidence showing that Toyota describes these replacement units as "Toyota-supplied" (*see* ECF 53-7, Ex. 6, Warranty Policy at TOY-Fitzgerald-2121). There is also a genuine dispute of material fact concerning whether Toyota maintained the replacement units on its price schedule. Toyota cites to evidence showing it does not maintain a price for Audio Navigation replacement parts (*see* ECF 54-7, Ex. G, Klein Decl. at ¶ 18); Fitzgerald cites to evidence showing that Toyota's own policy required Fitzgerald to use the same part number as the original Audio Navigation unit, which is listed in Toyota's price schedule (*see* ECF 53-7, Ex. 6, Houser Decl. at ¶ 6). These discrepancies create genuine disputes of material fact which a jury must resolve. For this reason, the court will deny the cross-motions for summary judgment.

## IV. Count IV: Violation of Md. Code Ann., Transp. § 15-212(c)(7)

Toyota has moved for judgment on the pleadings, or in the alternative for summary judgment, on this count. Section 15-212(c)(7)(ii) provides that a licensee may not directly or indirectly "[e]stablish or implement a special part or component number for parts used in warranty fulfillment, if the special part or component number results in reduced compensation for the dealer unless the part is used for specific, limited repair situations[.]" For the reasons explained above with respect to Count III, the court construes this motion as one for summary judgment.

Toyota argues that it is entitled to summary judgment because the Audio Navigation units do not constitute "special parts" in warranty fulfillment for "specific, limited repair situations." Fitzgerald appears to concede in its briefing that the same part number used for the original units was also used for the exchange unit in warranty replacements. (*See* ECF 53 at 18). This concession is confirmed by the record before the court. (*See* ECF 53-7, Ex. 6, Houser Decl. at ¶ 6; ECF 54-7, Ex. G, Klein Decl. at ¶ 16). Accordingly, there is no genuine dispute of material fact and Toyota is entitled to judgment as a matter of law on Count IV.

## CONCLUSION

For the reasons discussed herein, Fitzgerald's motion for summary judgment will be denied, and Toyota's motion for summary judgment will be granted in part (as to Count IV) and denied in part (as to the remaining counts). A separate Order follows.

| | |
|---|---|
| 9/23/2021 | /s/ |
| Date | Catherine C. Blake |
| | United States District Judge |

17